## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **DANA C. GRAY** | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| **v.** | ) | **Case No. 05-CV-2236** |
| | ) | |
| **FORD MOTOR COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the Motion to Dismiss (#52) and the Motion for Summary Judgment (#36) filed by the Defendant, Ford Motor Company ("Ford"). Following a careful and thorough review of all the motions and supporting documents filed by the parties, this court rules as follows: (1) Defendant's Motion to Dismiss (#52) is GRANTED; and (2) Defendant's Motion for Summary Judgment (#36) is GRANTED.

## FACTS[1]

On October 21, 2003, the Plaintiff, Dr. Dana Gray, and his wife, Tami Gray ("Tami"), bought their son, J.T. Gray ("J.T."), a previously owned 2001 Ford Explorer Sport Trac ("Explorer") for his sixteenth birthday. Around 3:00am on June 26, 2005, Tami awoke to the smell of smoke. She looked out her window and saw flames shooting out of the front of J.T.'s Explorer, which was parked in the driveway. She quickly woke Dr. Gray and J.T., exited the

---

[1] This statement of facts is based upon the parties' Statements of Undisputed Facts and the documents submitted by the parties. This Court has only included facts which are adequately supported by evidence in the record.

1

house, and called 911.  After the family had safely exited the home, the flames from the front of

the Explorer spread to the garage.  Although the firefighters were able to control the fire, the fire

caused extensive damage to the house and the lawn.  In particular, the fire caused the ceiling of

the garage to collapse, which destroyed old china and silver, children's clothing, old dolls, toys,

sports equipment, and picture albums which had all been stored in the attic.  Additionally, the

fire (in combination with the later re-construction efforts) destroyed much of Tami's award

winning garden.  Thankfully, no member of the Gray family suffered any physical injuries as a

result of the fire.

At the time of the fire, the Plaintiff's home and automobiles were insured by Cincinnati

Insurance Company ("Cincinnati"), under policies providing Plaintiff with over $400,000 in

coverage.  Plaintiff, after the fire, filed a claim and received a payment totaling $183,425

covering a variety of property damage suffered by the Plaintiff.  This reimbursement covered

losses suffered by the Plaintiff including the actual structural damage to the home and garage;

loss of the Explorer; family heirlooms, including two or three sets of china, children's clothing,

dolls, toys, sports equipment and pictures; and some of the landscaping damage suffered.

## PROCEDURAL HISTORY

On September 15, 2005, Plaintiff filed a complaint against Defendant in the Circuit Court

of the Sixth Judicial Circuit, Champaign, Illinois.  On October 19, 2005, Defendant removed the

case to this court on the basis of 28 U.S.C. §§ 1332 and 1441.  Thereafter, the case was

transferred to the Eastern District of Michigan pursuant to a Judicial Panel on Multidistrict

Litigation Transfer Order.  In June 2006, the transferee court issued Case Management Order

No. 1, which designated Plaintiff's attorney as co-lead counsel for the co-plaintiffs, who were

2

ordered to and did file a Master Amended Complaint, incorporating the claims made in each individual case.  In January 2009, by stipulation of the parties, co-plaintiffs were given leave to file the Fourth Amended Master Complaint, in which only common law negligence and strict products liability claims were advanced.  At the conclusion of the Multidistrict Litigation, the District Court for the Eastern District of Michigan issued a Suggestion of Remand Order, finding that "the only claims to be tried . . . [on] remand are claims asserting common law negligence and strict products liability arising under state law."  Pursuant to the Suggestion of Remand and the Conditional Remand Order, the stay was lifted and Plaintiff's case was reopened in this court on September 9, 2010.

On December 1, 2010, Plaintiff filed his Amended Complaint (#21) against Defendant, alleging: (1) a strict product liability claim; and (2) an Illinois Consumer Fraud Act claim.  In regards to damages, the Plaintiff sought to recover damages for emotional distress, the loss of personal property in excess of that already paid by his insurer, and lost income.[2]  On December 10, 2010, Plaintiff filed a Motion for Leave to File an Amended Complaint (#22), which was denied by this court.  On March 16, 2011, Defendant filed a Motion to Dismiss Count II of Plaintiff's Amended Complaint (#28).  On April 4, 2011, Plaintiff filed a Response (#30) to Defendant's Motion to Dismiss Count II, in which the Plaintiff conceded that Count II was barred by the multidistrict litigation and also renewed his petition for leave to file an Amended Complaint.  On July 18, 2011, this court entered an Order (#48) granting Defendant's Motion to Dismiss Count II of Plaintiff's Amended Complaint (#28) and granting Plaintiff's Renewed

---

[2]  Dr. Gray owned a dental practice and was forced to miss three consecutive days of work immediately following the fire.  In addition, Dr. Gray claims he lost productive time while supervising the rehabilitation of his home.

Petition for Leave to File Amended Complaint Asserting Negligence (#30).  In the Order, this court expressly stated the following: "Plaintiff is instructed to comply with Judge Friedman's order in his Suggestion of Remand.  Plaintiff may only bring claims for common law negligence and strict products liability arising under state law."

On June 15, 2011, Defendant filed a Motion for Summary Judgment (#36) and attached supporting exhibits.  Defendant argued that it is entitled to summary judgment because: (1) Plaintiff failed to offer admissible expert testimony demonstrating that the speed control deactivation switch was defective; (2) Plaintiff failed to offer admissible expert testimony establishing that the speed control deactivation switch was the proximate cause of the fire; and (3) Plaintiff has not identified any recoverable damages from the fire.

On July 11, 2011, Plaintiff filed a Response to the Motion for Summary Judgment (#39) and attached supporting exhibits.  Plaintiff argued that summary judgment is not appropriate because: (1) Dr. Charles Pendleton ("Dr. Pendleton") is qualified to render an opinion to a reasonable degree of scientific certainty that the speed control deactivation switch was defective; (2) Dr. Pendleton and John Knapp ("Knapp") are qualified to render opinions to a reasonable degree of scientific certainty regarding the origin and cause of the vehicle fire; and (3) there is a genuine issue of material fact regarding recoverable damages.  The first expert, Knapp, is a fire investigator with seventeen years of experience investigating the origins of vehicle fires.  Knapp testified that the fire originated in the engine compartment of the Explorer, on the driver's side forward of the firewall.  The second expert, Dr. Pendleton, teaches high school and college level courses on the theory and servicing of automotive systems.  In addition, Dr. Pendleton has conducted 300 investigations of automotive failures, about ninety percent of which resulted in

4

fires.  Utilizing Knapp's determination of the origin of the fire, Dr. Pendleton testified in his

deposition that the fire was caused by an electrical circuit igniting the brake fluid contained

within the cruise control disconnect switch.  Dr. Pendleton also provided an opinion in his

deposition that the cruise control disconnect switch was defective.

On July 26, 2011, after the parties' filings in regards to the Defendant's Motion for

Summary Judgment (#36), Plaintiff filed a Second Amended Complaint (#50), alleging: (1) a

strict product liability claim; (2) a negligence claim; (3) a willful and wanton negligence claim;

and (4) a negligence claim based on *res ipsa loquitur*.  Under Local Rule 7.1(E), as a result of

the filing of the Second Amended Complaint, all pending motions became moot.  However, on

August 9, 2011, Defendant filed its Answer (#51), in which Defendant revived its Motion for

Summary Judgment (#36).  Additionally, on August 9, 2011, Defendant filed a Motion to

Dismiss (#52) Counts 3 and 4 of Plaintiff's Second Amended Complaint.  On August 26, 2011,

Plaintiff filed a Response (#53) to the Defendant's Motion to Dismiss Counts 3 and 4.  On

September 22, 2011, this court entered the following Text Order to ensure that the parties were

aware of the procedural impact of the Second Amended Complaint on the Defendant's Motion

for Summary Judgment:

> TEXT ORDER notifying parties that under Local Rule 7.1(e), as a result of the Plaintiffs
> filing of the Second Amended Complaint (#50), the pending Motion for Summary
> Judgment (#36) became moot. However, on August 9, 2011, when Defendant filed its
> Answer (#51), Defendant revived its Motion for Summary Judgment (#36). Plaintiffs
> Second Amended Complaint (#50) contained three additional counts, namely: (1) specific
> negligence; (2) willful and wanton negligence; and (3) general negligence. This court
> will treat the Defendants Motion for Summary Judgment (#36) as requesting summary
> judgment on the following counts of the Plaintiffs Second Amended Complaint: Strict
> Product Liability (Count 1); Specific Negligence (Count 2); and General Negligence
> (Count 4). This court will not consider the Willful and Wanton Negligence (Count 3)
> allegation in the Defendants Motion for Summary Judgment (#36). Both parties are
> hereby granted leave to file an additional response, if desired, in regards to the Motion

for Summary Judgment on the following counts of Plaintiffs Second Amended
Complaint: Specific Negligence (Count 2) and General Negligence (Count 4). Responses
due by 10/7/2011.

On October 7, 2011, Defendant filed a Memorandum in Support (#74) of its Motion for

Summary Judgment as permitted by this court. Plaintiff did not take the opportunity offered by

this court to file an additional response focusing on the Motion for Summary Judgment as it

relates to his specific negligence and general negligence claims.

## ANALYSIS

## I.  MOTION TO DISMISS

On July 18, 2011, this court granted the Plaintiff's Renewed Petition for Leave to File

Amended Complaint Asserting Negligence (#30), believing that it was clear to the Plaintiff that

he could file one additional claim—specifically a negligence claim.  However, Plaintiff's Second

Amended Complaint (#50) not only retained the strict product liability claim and added the

negligence claim Plaintiff was granted leave to file, but also introduced two new claims: a willful

and wonton "negligence" claim and a negligence claim based on *res ipsa loquitur*.  Thereafter,

Defendant filed a Motion to Dismiss (#52) the willful and wanton conduct claim and the

negligence claim based on *res ipsa loquitur*, and Plaintiff filed a Response (#53).

The procedural history of this case makes it clear that the Plaintiff, in filing his Second

Amended Compliant, completely disregarded this court's Order (#48).  This court, although it

was not required to, granted the Plaintiff's Renewed Petition for Leave to File Amended

Complaint Asserting Negligence (#30).  In the Plaintiff's Renewed Petition, the Plaintiff's

request in his own words was as follows:

Therefore, for these reasons, Plaintiff respectfully requests this Court grant him leave to
replace Count 2 in Plaintiff's Complaint filed December 1, 2010 [Doc #21] with Count 2

6

asserted in Plaintiff's proposed Amended Complaint [Doc #22-1], as this result prejudices no party and serves the greater interest of justice in this matter.

This court only granted the relief requested by the Plaintiff—which was to allow Plaintiff to add the single count of common law negligence which had been contained as a proposed amended complaint (#22-1).  Therefore, **Plaintiff did not have leave to file any other claim**, and the attempt to include two new claims beyond what was requested in his request for leave is indicative of bad faith.[3]  Moreover, this court finds that allowing the Plaintiff to introduce new legal theories at this late stage of the litigation would not be in the interests of justice.  See Campbell v. Ingersoll Mill. Mach. Co., 893 F.2d 925, 927 (7th Cir. 1990).  This case was initially filed on September 15, 2005, and the Plaintiff has had the opportunity to file multiple amended complaints in this case.  Despite prior opportunities over the past six years to include additional claims, this court finds that there was undue delay because Plaintiff first made a request to include the willful and wanton claim on December 10, 2010, and first introduced the negligence claim based on *res ipsa loquitur* on July 26, 2011.  Therefore, this court finds that both the willful and wonton "negligence" claim and the *res ipsa loquitur* claims are dismissed because they were beyond the limited leave that the Plaintiff was given by this court to amend his complaint and allowing further leave to amend would not be in the interests of justice.

## II.  MOTION FOR SUMMARY JUDGMENT

---

[3]Moreover, Magistrate Judge David G. Bernthal previously denied Plaintiff's request to file a willful and wonton conduct claim in an Order (#24) entered on January 10, 2011.  The transferee court, the District Court for the Eastern District of Michigan, stated that "the only claims to be tried . . . [on] remand are claims asserting common law negligence and strict products liability arising under state law."  Since transferor judges are not permitted to modify orders issued by transferee judges, the Suggestion of Remand and its limitations on the kinds of claims to be brought on remand are to be given great deference by this court. See 28 U.S.C. § 1407; Allegheny Airlines, Inc. v. LeMay, 448 F.2d 1341 (7th Cir. 1971). This court agrees with Judge Bernthal's reasoning and finds no reason to disregard the transferor court's order here.

## A.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).  Speculation, however, is not the source of a reasonable inference.  See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998).

Therefore, the nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal."  Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).  Consequently, expert testimony which is offered by a party only supports a finding that there is a genuine issue of material fact if it is admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  See e.g., Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904-05 (7th Cir. 2007).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004).  Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial."

Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23.  "Conclusory allegations not supported by the record are not enough to withstand summary judgment."  Basith v. Cook County, 241 F.3d 919, 928 (7th Cir. 2001).

## B.  STRICT PRODUCT LIABILITY—DESIGN DEFECT

To prevail on a strict liability claim based on a product defect, the Plaintiff has the burden to demonstrate each of the following elements: "(1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition."  Mikolajczyk v. Ford Motor Co., 901 N.E.2d 329, 345 (Ill. 2008).  In its Motion for Summary Judgment (#36), Defendant argues that Plaintiff has failed to offer admissible evidence on three separate elements of his strict liability claim, specifically: (1) that the design of the cruise control deactivation switch ("switch") made it unreasonably dangerous; (2) that the defective condition of the switch proximately caused the injury; and (3) that the Plaintiff has failed to identify recoverable damages.  Since the failure to offer admissible evidence on any element of the *prima facie* case is sufficient to grant summary judgment on Plaintiff's strict product liability claim, this court will not consider whether there are any recoverable damages in this case, but will instead focus on whether Plaintiff has offered admissible evidence demonstrating that the switch was unreasonably dangerous and that the switch proximately caused the Plaintiff's injuries.

## 1.  DESIGN DEFECT—UNREASONABLY DANGEROUS

In order to recover for product liability under a strict liability theory, the plaintiff must plead and prove that the condition of the product was unreasonably dangerous.  Mikolajczyk, 901 N.E.2d at 335.  "A product may be found to be unreasonably dangerous based on proof of

any one of three conditions: a physical defect in the product itself, a defect in the product's

design, or a failure of the manufacturer to warn of the danger or to instruct on the proper use of

the product." Id.  In this case, the Plaintiff's pleadings indicate that he intends to proceed under

a design defect theory, so the other two theories will not be considered.

In product liability cases based on a product defect, Illinois law permits the plaintiff to

establish that a product is unreasonably dangerous, therefore defective, under two alternative

methods of proof:

> First, the plaintiff may introduce 'evidence that the product failed to perform as safely as
> an ordinary consumer would expect when used in an intended or reasonably foreseeable
> manner.'  This has come to be known as the consumer-expectation test.  Second, the
> plaintiff may introduce 'evidence that the product's design proximately caused his
> injury.'  If the defendant thereafter 'fails to prove that on balance the benefits of the
> challenged design outweigh the risk of danger inherent in such designs,' the plaintiff will
> prevail.  This test, which added the balancing of risks and benefits to the alternative
> design and feasibility inquiries . . . , has come to be known as the risk-utility or risk-
> benefit test.

Id. at 336 (citations omitted).

Under the risk-utility test, the plaintiff must offer proof that the risk of danger inherent in

the product design outweighs its benefits.  Calles v. Scripto-Tokai Corp., 864 N.E.2d 249, 255

(Ill. 2007).  In making this determination, the trier of fact may consider numerous factors,

including the following: (1) the availability and feasibility of alternative designs at the time of

the product's manufacture; (2) whether the design used conformed with the design standards of

the industry; (3) whether the design conformed with guidelines provided by an authoritative

voluntary association or criteria set by legislation or governmental regulation; (4) the likelihood

and seriousness of probable injury; and (5) the manufacturer's ability to eliminate the unsafe

character of the product without impairing its usefulness or making it too expensive to maintain

its utility.  See id. at 260-61.  Although a plaintiff is not required to show proof on each or any

specific factor, evidence on at least one factor is needed to establish a genuine issue of material

fact in order to be proper to submit to a jury.  Id. at 261.

Under the consumer-expectation test, a plaintiff must demonstrate that "the product failed

to perform as an ordinary customer would expect when used in an intended or reasonably

foreseeable manner."  Calles, 864 N.E.2d at 256.  Expert testimony is not required in all cases to

demonstrate that the product was unreasonably dangerous under the consumer-expectation test—

however, expert testimony regarding the product's defective condition is generally required if

the product involved is complex and beyond a lay jury's understanding.  Show v. Ford Motor

Co., 697 F. Supp. 2d 975, 982-83, 986 (N.D. Ill. 2010).

In this case, Plaintiff is alleging that the design of the cruise control deactivation switch

in Plaintiff's Explorer was defective.  While Plaintiff's complaint goes into great detail

explaining why the design of the switch was defective, in responding to the Defendant's motion

for summary judgment on this issue, the Plaintiff has only offered evidence supporting this

assertion in the form of deposition testimony by Dr. Pendleton.[4]  Dr. Pendleton is not an

electrical or mechanical engineer, although he does have a fairly extensive background in vehicle

investigations, investigating approximately 270 car fires over the past 30 years.  In his

deposition, Dr. Pendleton acknowledged that he had never reviewed engineering documents

related to the switch, had never reviewed the design or manufacturing process undertaken with

regards to the switch, and never reviewed any engineering documents of the switch.  He also

acknowledged that he had never compared the Ford switch design or manufacture with the

---

[4]In his report, Dr. Pendleton provides an opinion on the cause of the fire in question,
rather than providing an opinion or statements regarding whether the switch was in a defective
condition or was negligently designed.

11

design and manufacture of other switches utilized by other component suppliers.  After expressly

acknowledging this lack of expertise regarding the design and manufacture of the switch, he did

respond to a question asking him if he had an opinion on whether the design or manufacture of

the switch complied with the applicable standard of care:

> Q: Do you have any opinions regarding whether Ford . . . was negligent in designing or manufacturing the speed control deactivation switch at issue on a 2001 Ford Explorer Sport Trac?
>
> A:  My opinion is that I can't understand why Ford for 12 years used the same design switch and had recalled some 12 million vehicles for probably the biggest recall in the history of the automotive industry on one particular component that failed.  My figures might be a little off but I don't think I am too far off. It is my opinion that they shouldn't be, they should have had some type of feedback where people were having problems with these cruise control switches catching fire. And they somehow or other avoided changing the design year after year after year . . . .

Pendleton Dep. 19-20.  Later, Dr. Pendleton testified as follows:

> Q: And is it your opinion to a reasonable degree of scientific certainty that the cruise control disconnect switch that was present in the vehicle in question which was designed and manufactured with the cruise control disconnect circuit being energized at all times when the ignition was off and was not equipped with a fuse or circuit breaker to prevent fires such as in the event of a short was unreasonably dangerous?
>
> A: Yes. But it was equipped with a fuse. There is a fuse in the circuit. But you can have current flow and a fire, electrical fire, that doesn't approach the blowing point of the fuse. In other words, it is a 15-amp circuit. There may have been a 13-amp flow through there that would cause a fire but would not blow the fuse.
>
> Q: Is it your opinion to a reasonable degree of scientific certainty that allowing the ampage that could ignite a fire was unreasonably dangerous?
>
> A: Yes.
>
> . . .
>
> Q: Is it your opinion that the design of the switch [was] unreasonably dangerous [in] that [it] was not worth the risk of danger that it posed?
>
> A: Yes.

12

Pendleton Dep. 113-15.

From Dr. Pendleton's deposition, it is clear that the Plaintiff has failed to offer any proof that the risk of danger inherent in the design of the switch outweighed its benefits which might have satisfied the risk-utility test. The Plaintiff failed to identify or offer any proof going to any of the primary elements of the risk-utility test, such as the availability of alternative designs or the design standards of the industry. Therefore, the Plaintiff must rely on the consumer-expectation method of proof to establish that the switch was unreasonably dangerous.

The switch—particularly whether the potential for this particular switch design to result in an engine fire made it unreasonably dangerous—is complex and beyond the understanding of a lay jury, thus expert testimony regarding the switch's defective condition is required under the consumer-expectation test. See Show, 697 F. Supp. 2d at 986. Plaintiff does offer deposition testimony by Dr. Pendleton, albeit conclusory, that the design of the switch in question was unreasonably dangerous. Specifically, Dr. Pendleton did respond affirmatively to a question asking his opinion as to whether allowing a certain ampage of electrical current that could ignite a fire is unreasonably dangerous, however he offered very limited explanation for how he reached this opinion or how the opinion was supported by scientific principles and methods. Nevertheless, this statement, if admissible, when construing the evidence in the light most favorable to the Plaintiff, could support a determination by a jury that the switch in the Explorer was "unsafe when put to a use that is reasonably foreseeable considering its nature and function." See Mikolajczyk, 901 N.E.2d at 352. The admissibility of this opinion, however, depends on whether Dr. Pendleton's opinion satisfies the criteria set forth in Daubert.

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and the United States Supreme Court decision in Daubert. Naeem v. McKesson Drug Co., 444 F.3d

593, 607 (7th Cir. 2006).  Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Daubert explained that Federal Rule of Evidence 702 imposes an obligation on the trial court to ensure that scientific testimony by expert witnesses is "not only relevant but reliable."  See Daubert, 509 U.S. at 590.  The Supreme Court has explained that this "gatekeeping" obligation applies not only to scientific testimony, but all expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).  Therefore, Dr. Pendleton's opinion as to whether the switch was unreasonably dangerous must be grounded in the "methods and procedures of science."  See Daubert, 509 U.S. at 590.

The Seventh Circuit has explained that in order to satisfy the Daubert criteria, the expert must be able to show how his or her conclusion is based on an expert study of the issue.  Navarro v. Fuji Heavy Ind., Ltd., 117 F.3d 1027, 1032 (7th Cir. 1997).  Plaintiff has failed to direct this court to exactly how Dr. Pendleton's opinion that the switch was unreasonably dangerous is based on an expert study of the switch.  This court finds it surprising that the Plaintiff would attempt to rely on Dr. Pendleton's opinion as the sole evidence offered on this issue, as Dr. Pendleton's report, and the majority of his deposition, focus on the cause of the fire, not whether the switch was unreasonably dangerous.  Moreover, Dr. Pendleton expressly acknowledged his lack of expertise regarding the design, engineering and manufacturing of Ford's switch and any other manufacturer of switches utilized by other component suppliers.  His response to the first question on this issue was simply that he thought the switch was unreasonable dangerous

14

because Ford continued to use this switch design after having problems with it.  This response

certainly is not based on an expert study of the switch.  Later, Dr. Pendleton did briefly explain

that even though the switch had a circuit breaker a fire could start as a result of electric current

flow that remains below the flow required to blow the fuse.  Beyond this brief description of how

an electrical fire could result, Dr. Pendleton offered no explanation for his conclusion that the

switch was unreasonably dangerous.  Therefore, this court finds that Dr. Pendleton's opinion that

the switch was unreasonably dangerous is inadmissible because it is not based on reliable

principles and methods.  Therefore, in the absence of any other evidence offered by the Plaintiff

on this element on the *prima facie* case for strict product liability, summary judgment is

appropriate as a matter of law.

### 2.  PROXIMATE CAUSATION

In addition to failing to offer admissible evidence that the switch was unreasonably

dangerous, which by itself is sufficient to grant Defendant's Motion for Summary Judgment,

Plaintiff also fails to offer admissible evidence creating a genuine issue of material fact with

regards to causation.  Although Plaintiff is not required to conclusively prove that the alleged

defect in the switch caused the fire, to survive summary judgment the Plaintiff is required to

present some evidence that the alleged defect caused the fire, leading to Plaintiff's injuries.  See

Baltus v. Weaver Div. of Kidde & Co., 557 N.E.2d 580, 587-88 (Ill. App. Ct. 1990).

Specifically, with regards to the actual cause of the fire, the "plaintiff must establish a credible

basis for a reasonable inference that [the defective condition] of the product proximately caused

the injury and for elimination of reasonable secondary causes."  Phillips v. U.S. Waco Corp., 516

N.E.2d 670, 674 (Ill. App. Ct. 1987).  Defendant argues that the only testimony specifying that

the switch caused the fire, rather than some other cause such as a different electrical source in the

engine, is not based on a reliable scientific method.  Plaintiff argues, without directly addressing the challenge to the methodology used by Dr. Pendleton, that Dr. Pendleton's testimony rules out other possible causes of the fire.

In his deposition, Knapp testified, based on fire patterns, that the fire originated in the engine compartment of the Explorer—specifically the "driver's side of the engine compartment forward of the firewall."  Knapp Dep. 150.  However, it is undisputed that Knapp acknowledged that he was unable, without the support of an outside expert, to provide any opinion on what exactly caused the fire in the Explorer's engine compartment.  Id. at 150-51.  Defendant does not challenge Knapp's expert testimony that the fire originated in the engine compartment of the Explorer—rather they challenge this testimony's ability to establish that the alleged defect in the switch caused the fire.  Plaintiff has offered no response to this argument, therefore this court will focus on whether Dr. Pendleton's testimony is sufficient by itself to create a genuine issue of material fact with regards to whether the alleged defect in the switch caused the fire in question.

Defendant challenges the testimony of Dr. Pendleton with regards to the issue of causation primarily on the basis that he did not follow any recognized scientific method in arriving at his conclusion that a defect in the switch was the cause of the fire.  In his deposition, Dr. Pendleton provided the following relevant testimony as to causation, and the methods he used to reach his conclusions:

> Q: Would you agree with me that there is a procedure for investigating speed control deactivation switch fires?
>
> A: Yes, I guess there is.  I don't know what it is.  Maybe you could tell me.

16

Q: Is it the scientific method that you previously discussed?[5]

A: I think that would come into play, yes.

Q: Is there anything more specific than that that you are aware of?

A: No.

Q: Are . . . you aware of any documents out there, literature out there in the automotive investigation field that you can look at to tell you to zero in on a cause when you suspect a speed control deactivation switch fire?

A: No.

Q: You are not aware of anything like that?

A: No. And I say that because normally the switch is mostly plastic and it is completely destroyed if you find it at all after the fire. It is in such a state of disrepair that I don't see how any tests could be run on it.

. . .

Q: So it had to be an electrical fire in your opinion?

A: Yes.

Q: By saying except electrical, that doesn't rule out other electrical components that are on, correct?

A: Correct.

. . .

Q: But because of that spoilation, contamination, whatever word you used, you can't rule out other electrical components as the cause of this fire, correct?

A: Well, I think you can because of the fire patterns, burn patterns around the master cylinder of the various components.

Q: Aside from burn patterns, you can't and you have already testified that you are not an

---

[5]Dr. Pendleton indicated earlier in his deposition that when investigating vehicle fires, he follows the scientific approach, which involves determining that there is a problem, collecting and investigating data, and testing the hypothesis.

expert in burn patterns, correct?

A: Right.

Q: Is that right? Aside from the burn—

A: But there [are] two patterns here. There [are] melt patterns and burn patterns. If something is hot, it starts melting things adjacent to it. I don't call that a burn pattern. It is a melting pattern. A burn pattern is more on sheet metal hoods and so on.

Q: You feel you are qualified to determine a melting pattern or—

A: I think I am.  And it is more of just a common sense thing. Anyone could do that.

Q: Well, I am going to disagree with you because I am still trying to figure it out myself but it is your testimony that the melting patterns can . . . on this vehicle rule out the possibility of any other electrical component causing this fire other than the speed control deactivation switch?

A: Yes.

Q: And your basis for that as I indicat[ed] in the question is the melting patterns?

A: Yeah.

Q: Is there anything else that allows you to rule out other electrical components other than the melting pattern?

A: No.

Q: And melting pattern is distinct from burn pattern?

A: It is in my mind, yes.  However, when you get into scientific literature, a fire investigation manual and so on, they don't talk too much about melting patterns.

Q: Okay. What does?

A: I don't know.

Q: It is just something that you have experienced?

A: Yes.

. . .

18

Q: And is it your opinion . . . to a reasonable degree of scientific or automotive certainty that it is more likely than not that the fire was caused by an electrical failure at the cruise control brake disconnect switch?

A: Yes.

Q: And that the result of brake fluid and brake reservoir caused the fire? Is that your opinion?

A: Yes. The electrical circuit ignited the brake fluid in the cruise control disconnect switch. Then it was transferred to the reservoir of brake fluid which sits above it.

Pendleton Dep. at 40, 100-03, 111.  From this testimony, it is clear that Dr. Pendleton does offer an opinion that the cruise control disconnect switch design was the cause of the fire that, if admissible, would present a genuine issue of material fact in regards to causation of the fire. Therefore, the only question for the court is whether Dr. Pendleton's opinion would be admissible under Daubert.

As explained above, Daubert requires that Dr. Pendleton's opinion as to the specific cause of the fire must be grounded in the "methods and procedures of science."  See Daubert, 509 U.S. at 590; Navarro, 117 F.3d at 1032 (explaining that the expert must be able to show how his conclusion is based on an expert study of the issue).  The basis for Dr. Pendleton's opinion as to the cause of the fire is based on the origin of the fire—which was provided to him by Knapp—and his use of "melting patterns" to rule out other possible causes of electrical fire.  Dr. Pendleton's deposition indicates that although there might be another scientific method to determine whether the switch caused the fire, he was unaware of such a method.  Further, he indicated that although he based his opinion on the "melting patterns" of the fire, he was unaware of any scientific literature or investigation manuals that discuss the method of utilizing "melting patterns" to identify the cause of an electrical fire in a car engine.  Dr. Pendleton even indicated that the method of using "melting patterns" was a "common sense thing" that "anyone

19

could do."  Based on Dr. Pendleton's own acknowledgment, the foundation for Dr. Pendleton's opinion as to the cause of the fire is not "the product of reliable principles and methods" of fire investigation.  Therefore, this court finds that his opinion as to the cause of the fire is inadmissible as it is not based on reliable principles and methods.  Without this testimony, Plaintiff has failed to meet the *prima facie* case by demonstrating that the alleged defect in the switch caused the fire.  As a result, summary judgment on Plaintiff's strict product liability claim is appropriate.

### C.  NEGLIGENT DESIGN

In order to prevail on a products liability claim under a common law negligence theory, a plaintiff must establish the following elements: (1) an existence of a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by the breach. Calles v. Scripto-Tokai Corp., 864 N.E.2d 249, 263 (Ill. 2007).  Although the threshold question for products liability claims under a negligence or strict liability theory is the same—whether the product was unreasonably dangerous due to the existence of a defective condition—the key additional element in a negligence claim is the need to establish the defendant's fault.  Id. at 263-64.  A plaintiff may establish this element by demonstrating that the "manufacturer deviated from the standard of care other similar manufacturers followed at the time or show that the manufacturer knew or should have known of the risk posed by the product design [at the time of manufacture] and failed to warn the plaintiff of its dangerous propensities."  Show, 697 F. Supp. 2d at 986-87.  In this case, Plaintiff has failed to offer any proof demonstrating that Defendant either: (1) deviated from the standard of care of other manufacturers in designing the switch; or (2) knew or should have known of the fire danger that the switch created at the time they manufactured the 2001 Explorer.  Therefore, summary judgment is proper on the Plaintiff's

negligence claims as the Plaintiff has failed to offer any evidence supporting his allegations.

IT IS THEREFORE ORDERED THAT:

(1) Ford Motor Company's Motion to Dismiss (#52) Counts 3 and 4 of Plaintiff's Second Amended Complaint is GRANTED.

(2) Ford Motor Company's Motion for Summary Judgment (#36) is GRANTED on Counts 1 and 2 of Plaintiff's Second Amended Complaint.  Judgment is entered in favor of Ford Motor Company and against Plaintiff on Plaintiff's Second Amended Complaint.

(3) All outstanding motions in limine are dismissed as MOOT.

(4) This case is terminated.

ENTERED this 13th  day of October, 2011.

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE